## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| **DAVID EUGENE VATTER,** | ) | |
| Petitioner, | ) | **Civil Action No. 7:21cv00173** |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| **JOHN WOODSON, WARDEN,** | ) | **By:  Michael F. Urbanski** |
| Respondent. | ) | **Chief United States District Judge** |

David Eugene Vatter, a Virginia inmate proceeding pro se, has filed a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging his 2017 Augusta County Circuit Court conviction for first-degree murder in violation of Virginia Code § 18.2-32.  The respondent has filed a motion to dismiss, to which Vatter has replied, making this matter ripe for decision.  After reviewing the record, the court concludes that the respondent's motion must be granted, because the Virginia Supreme Court opinions addressing the issues were neither unreasonable determinations of fact nor unreasonable applications of federal law.

## I.

### A. Factual Background

According to the testimony at trial, Vatter called the rescue squad shortly after 7:30 p.m. on March 18, 2014, reporting that his wife was in severe pain and he thought she might be having kidney stones, a problem that she had previously experienced.  Emergency Medical Service workers responded and found Shelby Vatter, age 76, in the floor beside her bed, complaining of left flank pain.  She also had a bruise on her forehead.  Shelby was coherent,

but her speech was slurred.  CCR[1] at 598 – 604.  Several physicians testified about the deterioration in her health over the following days as they tried to find out what was causing Shelby's pain and deterioration.  On her arrival at the hospital, several vials of blood were drawn.  Her kidney function, PH, and calcium values were normal, but she continued to deteriorate, and by 1:00 a.m., she was intubated because she was having trouble breathing.  Id. at 659 – 675.

Dr. Avgeris assumed her care at 6:00 a.m. on March 19, at which time Shelby was comatose.  Laboratory workup included MRI and CT of her brain, EEG with consult from neurology, testing spinal fluid, and more blood work.  Although her blood pressure had been high when she was admitted, it fell too low, and she was given medication to raise the blood pressure.  Having ruled out infection and stroke, the doctor noted that Shelby's blood was showing increasing levels of lactic acid, indicating metabolic acidosis, a sign of a potential toxin.  Some of the blood vials drawn upon her arrival were sent to University of Virginia Hospital and to a lab in Pennsylvania to be tested for several toxins, including cyanide, metformin, carboxyhemoglobin, methanol, and ethylene glycol.  While awaiting those results, he started Shelby on dialysis, trying to remove toxins and preserve her kidneys, which had already begun shutting down.  After two days on dialysis, Shelby's EEG improved and she regained consciousness, opening her eyes and responding to stimuli.  Reports from the University of Virginia and from the lab in Pennsylvania came in revealing high levels of ethylene glycol in Shelby's blood.  By then, Dr. Avgeris had also noted the presence of calcium

---

[1] References to the Augusta County Circuit Court Record in Commonwealth v. Vatter, Record No. CR16000447, which includes all pleadings and transcripts before that court, will be abbreviated "CCR," followed by the page number typed in the lower right corner of each page in the record.

oxalate crystals in Shelby's urine, which crystals are a metabolic byproduct of ethylene glycol. Once able to determine the cause of her symptoms, antidotes to the ethylene glycol were administered, but her kidneys and other organs had sustained too much damage by that time, and Shelby died on April 8, 2014.  Had he known she consumed ethylene glycol when she first arrived at the hospital, her life likely could have been saved.  Id. at 675 – 701.

Dr. Amy Tharp, Assistant Chief Medical Examiner for the Roanoke Division of the Virginia Department of Forensic Science, testified that she performed the autopsy on Shelby. Based on Shelby's final medical records and exam findings of tubular necrosis in her kidneys, along with calcium oxalate crystals in her kidneys and other tissues, including around blood vessels in her brain, and a second analysis of a blood sample she sent to the same lab in Pennsylvania, Dr. Tharp concluded that the cause of Shelby's death was ethylene glycol poisoning, and the manner was homicide.  She acknowledged that all previous cases she had worked involving ethylene glycol poisoning had been either suicide or accidental ingestion. Id. at 721 – 750.

Dr. Chris Holstege, chief of clinical toxicology at University of Virginia, testified as an expert witness, based upon his 2016 review of the medical records and autopsy findings.  He explained to the jury that ethylene glycol is the primary ingredient in antifreeze, and that the substance is a toxic alcohol quickly metabolized by the body into acidic metabolites.  It has a sweet taste and can be disguised in certain food or liquid, including jello.  Shelby's blood, taken upon her arrival at the hospital and later analyzed by the Pennsylvania lab, revealed 480 mg/dL of ethylene glycol in the blood, nearly twenty times higher than a lethal amount.  Based on the progression of her symptoms and kidney function, PH, and other blood tests, Dr. Holstege

opined that the ethylene glycol had been consumed in a single, one-time dose, approximately one to two hours before Vatter's phone call to 911, based on her history of having eaten nothing that day.  For the dose to cause the 480 mg. level, he estimated that she had consumed seven ounces of pure (100% ethylene glycol) antifreeze or fourteen ounces of 50% antifreeze. Id. at 752 – 758.

## B. Procedural Background

### 1. Arrest and Trial

Vatter was arrested on November 30, 2016, and charged with first-degree murder of his wife by poisoning.  Investigator Steve Cason with the Augusta County Sheriff's Office interrogated Vatter for 6 ½ hours regarding the circumstances surrounding Shelby's last day at home.  Vatter did not request a lawyer.  His statements to Cason were compared to the statements he gave to Investigator Paul McCormick during several different interviews, totaling 12 – 15 hours, in March 2014 and subsequent months.   There were minor discrepancies in the timeline (such as whether he went to the pharmacy at 11:00 a.m. or 2:00 p.m.) and other minor details, but Vatter consistently maintained that he did not kill his wife of twenty years and that he loved her very much.  Also, consistent with his earlier statements, Vatter testified that he picked up carryout dinner for them at 5:00 pm and went straight home (just 3 miles away), and he and Shelby were home alone together from then until he called the rescue squad.  Having adamantly insisted in 2014 that his wife would never kill herself, on November 30, 2016, he conceded to Cason that suicide was possible.  Id. at 830 – 866. Immediately after Cason's interrogation, Special Agent John Cromer of the Virginia State

Police also questioned Vatter; Vatter advised that he had a $70,000 life insurance policy on his wife.

Prior to trial, counsel filed a motion in limine seeking to exclude the toxicology reports from evidence, on the grounds that their admission would deny Vatter the constitutional right to confront and cross examine his accusers.  The trial court denied that motion, finding that the toxicology reports were admissible as business records prepared in the normal course of business for non-testimonial purposes.  Id. at 150 – 155.

At the jury trial beginning August 7, 2017, in addition to the medical evidence previously discussed and the statements of Vatter to investigators, Paul McCormick (no longer with the Sheriff's Office) testified about his initial investigation of Shelby's hospitalization and death.  Acting on a tip from a concerned citizen (later identified as neighbor Diane Urvan, CCR at 277) about a possible poisoning by her husband, Cason contacted the Augusta Medical Center on March 19.  He advised the hospital that Vatter had to be accompanied by someone any time he visited his wife for the remainder of her stay at the hospital.  He also questioned Vatter, who was very cooperative.  Vatter allowed him to search the home without a warrant and turned over all medications in the home, including his own prescription for metformin. A few days later, when ethylene glycol had been identified, Vatter acknowledged having antifreeze on the property, and took McCormick to the unfinished basement in his home, where Vatter (an interstate truck driver) had several car-maintenance items, including bottles of 50% antifreeze, which McCormick confiscated.   McCormick took several pictures throughout the house, and he also collected a cup with a straw from Shelby's nightstand. Analysis of the cup and straw revealed no traces of ethylene glycol.  Id. at 780 – 829.

Howard Mulholland, a senior financial investigator at the Virginia Attorney General's office, testified about his review of numerous records regarding the Vatters' financial condition.  Although Shelby had purchased the home with an inheritance from her mother, and the home had been completely paid for, at the time of her death a $150,000 reverse mortgage on the home was in default.  They owed $18,000 in back payments, and the home was scheduled for foreclosure at auction on April 3 or April 4, 2014, just a couple of weeks after Shelby's admission to the hospital.  The joint bank account was frequently overdrawn, and overdraft fees had been substantial during the prior year.  Both Vatters had health problems, and Shelby, in particular, accrued significant medical bills during the year and a half prior to her death, including for surgery resulting in permanent placement of a colostomy bag, for which she had to buy regular supplies.  Her medical expenses exceeded $1200 per month, which was more than her pension and social security combined.  Mulholland did not know whether payment of the outstanding $18,000 would save the home from foreclosure, because different lenders have different policies.  He did not know the practice of Vatter's lender.[2]  Id. at 875 – 891.

A few neighbors and friends testified that Shelby was a bubbly, gregarious, kind, and generous lady.  Id. at 610, 893 – 900, 986 – 995.  One neighbor, Diane Urvan, testified that she last spoke to Shelby on the phone on March 15, 2014, discussing Shelby's financial concerns.  She testified that Shelby said she was not worried about the foreclosure and bankruptcy, because David "would bump her off" before.  Id. at 1026.  She also said David

---

[2] There was no testimony indicating whether the home ever was foreclosed on, and no insurance policy was ever introduced in evidence, as apparently no policy was ever found.  CCR at 1074, 1086.

had been asking her about her life insurance.  Urvan said she asked Shelby why she was saying

such things, and Shelby said, "You don't know him like I do."  Id. at 1027.

Patricia Cash, a friend who belonged to a gospel music club with Shelby, testified that

Shelby purchased a dulcimer for herself and one for her daughter early in 2014, saying that

David would be upset with her for purchasing one for her daughter.  Id. at 939.  Susan Smiley,

Shelby's daughter, testified that she and her mother were scheduled to start dulcimer lessons

the week following her mother's admission to the hospital.  Smiley also testified that her father

died in 1992, and her mother married Vatter, her stepfather, in 1994.  Id. at 916 – 918.  She

did not find out her mother was in the hospital until the day after her mother's admission,

when Vatter called her at work to tell her.  Even then, she had no idea how serious her

mother's condition was until she went to see her and found her in the ICU.  Id. at 920 – 921.

Both Cash and Smiley testified that Shelby got anxious and started looking at her watch to

make sure she went home before David arrived home.  Id. at 920, 939.

Tim Boyers, a local restaurant owner, testified that he had first met Vatter when Vatter

patronized the truck stop where Boyers worked.  He was instrumental in helping Vatter secure

his trucking position with Wal Mart in 2006.  Later, Boyers opened his restaurant, and the

Vatters were frequent customers.  Boyers testified that he often saw Vatter speak harshly to

Shelby and thought he treated her mean.  Id. at 926 – 930.  Diane Urvan implied that Vatter

did not allow Shelby to have friends over when he was home.  Id. at 612.

Felicia Roberts, who worked at another restaurant where the Vatters had been regular

customers testified that Vatter came into the restaurant two weeks after Shelby's death and

was trying to sell Shelby's belongings—purses, a bird, and other items.  Id. at 977 – 985.

Likewise, Lisa Blackford, a salon operator who did Shelby's nails, testified that Vatter came to the salon after Shelby died and tried to sell their wedding rings.  Id. at 986 – 995.

The defense called two witnesses, Bruce Hoffman from Wal Mart and Pastor Bobby Campbell.  Hoffman testified that Vatter worked as a truck driver for Wal Mart from 2006 through 2015, covering the mid-Atlantic and Northeast states.  His schedule was generally to be on the road five days and then home for two or three consecutive days before the next trip.  However, whenever the store received a call that his wife was sick in the hospital, Vatter was contacted and allowed to go home and tend to her, as they did for all employees.  Vatter had received several such contacts during the last two years of Shelby's life.  Hoffman also saw Vatter and Shelby together at company family outings, and the two seemed to share a loving and good relationship.  Id. at 1033 – 1037.  Pastor Campbell testified that he had known the Vatters since he started as Associate Pastor at Calvary Baptist Church in 1995 or 1996.  The Vatters were already married when Campbell arrived, and they regularly attended church together.  Because of Vatter's trucking schedule, he usually attended every two or three weeks, when he was in town.  He testified that he had never seen Vatter behave disrespectfully to his wife and that they always appeared to be a strong, loving, faithful couple.  Vatter continued attending the church after Shelby's death.  Id. at 1038 – 1042.

Following two and a half days of testimony, the jury deliberated on August 9, 2017, and returned a verdict of guilty.  No additional evidence was offered, and after argument on sentencing, the jury recommended a penalty of life in prison plus a fine of $100,000.  Id. at 196 – 197.  The court denied a motion to set aside the verdict.  Id. at 1131.  Following preparation of a presentence report, the trial court presided over a sentencing hearing on

November 15, 2017, before imposing the sentence recommended by the jury. The court entered its final judgment order on November 29, 2017. Id. at 299 – 300.

### 2. **Direct Appeals**

Vatter timely appealed the court's decision, raising as his sole issue that the trial court erred in admitting the toxicology reports into evidence. By per curiam opinion, the Court of Appeals affirmed the trial court's decision, finding that the toxicology reports qualified as business records kept in the ordinary course of business, that their regularity sufficiently established the reliability of the chain of custody, and that the statutes relied upon by Vatter did not demand a different result. Vatter v. Commonwealth, No. 1883-17-3 (Va. Ct. App. Aug. 28, 2018).

The Supreme Court of Virginia refused Vatter's further appeal. Vatter v. Commonwealth, No. 181194 (Va. May 31, 2019). Vatter did not file a petition for certiorari with the United States Supreme Court.

### 3. **Habeas Proceedings**

Vatter filed a petition for a writ of habeas corpus in the Supreme Court of Virginia on May 20, 2021, raising three issues: (1) Violation of his due process rights because he was not given credit for his "good time" credits while in the regional jail; (2) Ineffective assistance of counsel because counsel did not argue to the jury that less weight should be given to the toxicology report because of the lack of chain of custody; and (3) Ineffective assistance of counsel for failing to challenge the constitutionality of Virginia Code § 19.2-188, allowing an autopsy report into evidence. The court found all claims to be without merit and dismissed the petition on March 10, 2021. Vatter v. Woodson, No. 200700 (Va. Mar. 10, 2021).

On the first claim, the court held that Vatter was not entitled to have his sentence reduced by good time credit because he was serving a life sentence, citing Virginia Department of Corrections (VDOC) Operating Procedure 830.3. On the ineffective assistance of counsel claims, the court found neither deficient performance nor prejudice to support the claims. The trial court having ruled that the chain of custody for the toxicology reports was presumptively reliable, counsel could reasonably conclude that making the contrary argument to the jury would not be effective. As for admissibility of the autopsy report, the court noted that the medical examiner who performed the autopsy testified at trial, subject to cross-examination, and the report was identified by the medical examiner and introduced as an exhibit during her testimony, making Vatter's objection to Code § 19.2-188 moot.

Less than two weeks after the state habeas decision, Vatter timely filed his § 2254 petition, raising the following issues:

1. His due process rights were violated by denial of sentence reduction for good time credit accrued while he was in the county jail.

2. His trial counsel was ineffective for failing to argue that the jury should give less weight to the toxicology report because of the lack of chain of custody.

3. His trial counsel was ineffective for failing to challenge the constitutionality of Virginia Code § 19.2-188, allowing certified autopsy reports into evidence.

4. The trial court violated his constitutional right to confront and cross examine his accusers by allowing the toxicology report into evidence.

Because the Supreme Court had the opportunity to consider each issue on its merits (either in the state habeas case or on direct review), Vatter has properly exhausted his state remedies.

## II.

A federal court may grant a petitioner habeas relief from a state court judgment if the petitioner is in custody in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a).  However, federal courts reviewing claims that have been adjudicated on the merits in the state court may grant relief on such a claim only if the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d)(1)-(2).  When reviewing a claim of ineffective assistance of counsel, courts also apply a highly deferential standard.  A petitioner must show that (1) counsel's performance was so deficient that he was not functioning as counsel guaranteed by the Sixth Amendment <u>and</u> (2) that the deficient performance prejudiced the defense. <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984).  When reviewing a state court's assessment of an ineffective assistance of counsel claim, federal review is "doubly deferential," because the deferential standard of review under the statute overlaps with the deferential standard under <u>Strickland</u>.  <u>Cullen v. Pinholster</u>, 563 U.S. 170, 190 (2011).  In other words, the federal court is to afford "both the state court and the defense attorney the benefit of the doubt." <u>Burt v. Titlow</u>, 571 U.S. 12, 15 (2013).

Deficient performance requires a showing that counsel's performance fell below "an objective standard of reasonableness . . . under prevailing professional norms."  <u>Strickland</u>, 466 U.S. at 688.  The reviewing court must not rely upon "the distorting effects of hindsight," but must presume that counsel's decisions and actions fell within the wide range of reasonable

strategy decisions.  Id. at 689–90.  To establish prejudice under Strickland, Vatter must show that there was "a reasonable probability that the outcome of the proceedings would have been different," which means a probability sufficient to undermine confidence in the outcome."  Id. at 694.

Using the standard of review required by § 2254(a) and the criteria in Strickland, the court will address each of Vatter's claims, starting with the first three claims, which were raised in his state habeas petition.

## A.  **"Good-Time" Credit**

The Supreme Court of Virginia rejected this habeas claim by noting that persons serving a life sentence are not eligible for a reduction in sentence.  Vatter v. Woodson, No. 200700, slip op. at 1 (Va. March 10, 2021).  The court further noted that Vatter has benefitted from application of the good time credit he earned in the county jail, because such credit is applied for recognition and other purposes.  Id.  Vatter alleges that the court's decision is an unreasonable application of federal law because it violates the Fourteenth Amendment of the Constitution, citing Wolff v. McDonnell, 418 U.S. 539, 558 (1974).  He further alleges that VDOC operating procedure 830.3 does not apply and is unconstitutional.

Vatter misunderstands the application of Wolff.  The Court in Wolff specifically recognized that the Constitution does not guarantee good-time credit for good behavior in prison.  418 U.S. at 557.  However, if a state creates a right to good-time credit and provides that such credits, once earned, can only be taken away if the prisoner is guilty of serious misconduct, then the state has created a sufficient liberty interest in the credit already earned that it cannot be taken away without due process that affords the prisoner a meaningful

opportunity to contest the alleged misconduct.  Id. at 558.  That situation does not exist here because Vatter has received credit for his good behavior, but he is not eligible for a sentence reduction from a life sentence.

To understand the systems in place for potential early release, the statutes and regulations regarding sentencing, parole, and good time credit must be read and construed together.  In this case, that starts with understanding that parole has been abolished in Virginia for felony offenses committed on or after January 1, 1995.  Va. Code § 53.1-165.1.  In other words, "life means life."  Yarbrough v. Commonwealth, 258 Va. 347, 374, 519 S.E.2d 602, 616 (1999).[3]  Virginia Code § 53.1-202.2(A) states:

> Every person who is convicted of a felony offense committed on or after January 1, 1995, and who is sentenced to serve a term of incarceration in a state or local correctional facility shall be eligible to earn sentence credits in the manner prescribed by this article.   Such eligibility shall commence upon the person's incarceration in any correctional facility following entry of a final order of conviction by the committing court.  As used in this chapter, "sentence credit" and "earned sentence credit" means deduction from a person's term of confinement earned through adherence to rules prescribed . . . and by meeting such other requirements as may be established by law or regulation. . . .

Id. (emphasis added).  The state legislature assigned responsibility for establishing the rules and criteria to implement the system of good-time credits to the Board of Corrections.  Va. Code § 53.1-202.1.  VDOC Operating Procedure 830.3 is the procedure adopted by the Board.

---

[3] Vatter may be eligible for discretionary geriatric parole under Virginia Code § 53.1-40.01 at some point, because he was convicted of first-degree murder, not capital murder.  However, eligibility for parole does not change the nature of a life sentence for purposes of sentence reduction credits.  See Escamilla v. Outlaw, 335 F. App'x. 382, 384–85, 2009 WL 1616124 at *2 (5th Cir. 2009) (unpublished) (holding that prisoner was not entitled to have good-time credits subtracted from his parole date, because parole date was discretionary, not a sentence or term of incarceration).

That procedure clearly states in multiple locations that inmates serving a life sentence cannot receive earned sentence credits.  VDOC Op. P. 830.3 at 2, 8, 11.

A person serving a life sentence is not serving "a term of incarceration" or confinement.  Johnson v. Johnson, No. 7:09CV00207, 2009 WL 2337994, at *3 (W.D. Va. July 27, 2009).  A term is "a period of time to which limits have been set."  Dictionary.com (last accessed February 24, 2022).  Construing a similar challenge to North Carolina's good-time credit statute, under which the DOC administered good time credits for the purpose of determining the custody grade of persons with a life sentence, but not sentence reduction, the Fourth Circuit Court of Appeals stated that "there was nothing arbitrary about the DOC's failure to apply good time credits to reduce his life sentence, and nothing that was rightfully his was abrogated."  Waddell v. Department of Correction, 680 F.3d 384, 395 (4th Cir. 2012).

Indeed, it would not be logical or possible to deduct time from a life sentence, because no one knows the date certain that Vatter's life will end.  For this reason, other state and federal courts have also rejected the argument that Vatter makes.  E.g., Johnson, at *3; Glascoe v. United States, 358 F.3d 967, 969 (D.C. Cir. 2004); Hunt v. Warden, 111 Nev. 1284, 1285, 903 P.2d 826, 826 (1995); Escalanti v. Department of Corrections, 174 Ariz. 526, 528, 851 P.2d 151, 153 (Ct. App. 1993).  Not only is it mathematically impossible to subtract credit from a life sentence, but this interpretation of the statute would also be inconsistent with the requirements of other laws, including that a sentence of life be imposed, without parole.  The court is not required to interpret a law in a way that reaches implausible results.  Glascoe, 358 F.3d at 969.  Nor is it appropriate for a federal habeas court to impose a different interpretation

on a state law than that reasonably adopted by the state's courts and agencies. <u>Estelle v. McGuire</u>, 502 U.S. 62, 67–68 (1991).

Vatter maintains that procedure 830.3 is unconstitutional and inapplicable to his case, because he seeks the good-time credit he earned in the regional jail from November 2016 through November 2017, most of which time he was awaiting trial and had not yet been convicted.  Vatter may well have anticipated that his good-time credit would result in a sentence reduction, if he were convicted and received a sentence, but if he thought those credits would apply to offset a life sentence, he was not thinking logically and did not consider the full jail policy.  The Department of Corrections has adopted procedures for inmates to accrue some good-time credit in local and regional jails.  VDOC Op. P. 830.4.  Unclassified offenders (those who have not yet been classified by the DOC) accrue good-time credit at 2.25 days for each 30 days of satisfactory conduct.  <u>Id.</u> at § I(D)(3).  Even the procedure for jails notes that "An offender who is sentenced to a term of life imprisonment . . . has no release date; therefore, Earned Sentence Credits are not a factor in their time computation."  <u>Id.</u> at § I(D)(8).

The state has not created a liberty interest for inmates serving a life sentence to receive a time reduction for good behavior.  Further, there is no constitutional right to good-time credit.  <u>Wolff</u>, 418 U.S. at 557.  Because there is no such right in this case, state-created or otherwise, there can be no due process violation associated with denying a time reduction for good-time credits earned by offenders serving a life sentence.  The prison has not taken away Vatter's vested right to a time reduction; the administration has merely clarified what benefits he is entitled to receive (classification, recognition) for his good behavior.  Under Virginia law,

since 1995, those benefits do not include a reduction of his life sentence.  Based upon the record and the law, the state Court's decision was reasonable.

## B. __Counsel's Failure to Argue Chain of Custody to the Jury__

The Supreme Court of Virginia found that Vatter did not establish either deficient performance or prejudice in this claim for ineffective assistance of counsel.  As previously explained, __Strickland__ requires a petitioner to show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms.  466 U.S. at 688. The Supreme Court has declared that review of counsel's closing argument must be highly deferential, especially when conducted on federal habeas review, where the court must be doubly deferential.  __Yarborough v. Gentry__, 540 U.S. 1, 6 (2003).  Choosing what points to emphasize in closing argument is part of the art of persuasion in practicing law, and "deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage."  __Id.__

Counsel's closing argument had a coherent theme, emphasizing the absence of direct proof that Vatter had anything to do with his wife's consumption of antifreeze and pointing out the numerous ways that his conduct was completely inconsistent with the behavior of a guilty person.  Maintaining credibility with the jury is important, and counsel could reasonably have concluded that attacking the chain of custody on the multiple toxicology reports would not be persuasive to a jury, would sound more like a technicality than a failure in the government's burden of proof.  The state court's decision that there was no defective performance was not unreasonable.

16

Likewise, the finding of no prejudice is a reasonable finding of fact and a reasonable application of existing law.  To establish prejudice, Vatter must show "a reasonable probability that the outcome of the proceedings would have been different."  Strickland, 466 U.S. at 694. Three different toxicology reports identified ethylene glycol in Shelby's blood: One report obtained by the hospital from the Pennsylvania lab, one obtained by the hospital from the University of Virginia lab, and one obtained by the medical examiner from the Pennsylvania lab.  As the state habeas court concluded, counsel reasonably could have determined that the likelihood was low that the jury would return a different verdict because of possible chain of custody problems on all three samples of blood.

Because the state habeas court's determination of facts and application of law were reasonable, the court cannot grant relief on this claim.

**C.  Counsel's Failure to Challenge the Constitutionality of Virginia Code § 19.2-188**

Virginia Code § 19.2-188 allows certified reports of autopsies to be received into evidence in court proceedings.  Vatter contends that this Code section violates the Confrontation Clause for the reasons set forth in Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009).  The state habeas court found that Code § 19.2-188 was not implicated in Vatter's trial however, because that statute was not the basis for the autopsy's admission into evidence. In Vatter's trial, Assistant Chief Medical Examiner Amy Tharpe testified in person about the autopsy she conducted, identified the photographs she took, and explained her findings and conclusions.  She prepared the autopsy report and identified it as the report she prepared. Only then was the report admitted into evidence.  Dr. Tharpe was also subject to cross-examination regarding all findings and conclusions she made.

The state court's factual finding regarding the admission of the autopsy report is supported by the record, making it a reasonable determination of facts.  Because the statute was not the basis for admitting the autopsy report, counsel's performance was not deficient in failing to object to the statute on constitutional grounds.  Counsel is not required to file futile, irrelevant, or unnecessary motions.  Sharpe v. Bell, 593 F.3d 372, 383 (4th Cir. 2010).  Had the Commonwealth tried to introduce the autopsy report under the statute, without the benefit of Dr. Tharpe's testimony, that would have been a different situation.

While counsel could have filed a pre-trial motion regarding applicability of the statute, there were strategic reasons not to do so, as filing the motion ahead of trial would have guaranteed that the prosecutor would produce Dr. Tharpe as a witness at trial.  By saving the objection for trial, if the Commonwealth tried to rely on the statute alone for admissibility, the objection would have had a better chance to benefit Vatter.  However, the Commonwealth called Dr. Tharpe, rather than relying on the statute, removing the constitutional objection as an issue.  In Melendez-Diaz, the court did not hold that such documents are never admissible, only that such testimonial documents cannot be substituted for the live testimony of the person preparing them.  557 U.S. at 309.  Assuming without deciding that an autopsy report qualifies as a testimonial document—one prepared under circumstances which would lead a reasonable person to believe that its preparation was for use at a trial, the Confrontation Clause requires only that the witness appear in person to testify, subject to cross-examination by the defense.  Id. at 310.  Had counsel challenged the statute, even successfully, the result would be that the Commonwealth had to introduce Dr. Tharpe in person as a witness to get the

autopsy into evidence.  That is what the Commonwealth did anyway.  Accordingly, Vatter suffered no prejudice from any failure to file a pretrial motion objecting to Code § 19.2-188.

The state habeas court's decision is a reasonable application of state law and a reasonable determination of facts.  Therefore, the court cannot grant relief on this claim.

## D. <u>Trial Court's Denial of Motion in Limine</u>

Vatter contends that the state trial court erred in denying counsel's motion to exclude the blood toxicology reports from evidence.  In particular, he alleges that there is no statutory authority for admission of the toxicology results in a murder prosecution. He notes that Virginia Code § 19.2-187.02 authorizes admission, under the business records exception, of blood alcohol tests conducted by a hospital for purposes of treating the patient, but this statute only applies in cases charged under seven different statutes related to drunk driving and vehicular manslaughter.  Normally, it is "not the province of a federal habeas court to reexamine state-court determinations on state-law questions" such as admissibility of evidence.  <u>Estelle v. McGuire</u>, 502 U.S. 62, 67–68 (1991).  However, the federal habeas court can consider whether admission of evidence violated a defendant's constitutional rights, as Vatter also alleges.

This issue was presented to the state's highest court on direct appeal, rather than in his habeas proceeding.  The Supreme Court of Virginia summarily refused Vatter's petition, leaving the written opinion of the Court of Appeals of Virginia as the last reasoned state court opinion.  In this situation, a federal habeas court "looks through" the high court's refusal of the appeal and reviews the reasoning of the court of appeals.  <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803 (1991) (holding that federal habeas court must presume that "[w]here there has been

one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."). The deferential standard of review prescribed by § 2254(d) will apply in the court's review of the court of appeals' opinion.

The court of appeals noted that Virginia Code § 19.2-187.02 begins with the introductory words "[n]otwithstanding any other provision of law," suggesting that other laws may also govern the admissibility of medical reports. This code section applies specifically to one type of medical report, blood alcohol tests, related to prosecution of "offenses requiring proof of intoxication." Vatter, No. 1883-17-3 at *4. The statute does not preclude admission of medical reports as business records, under other legal authority, in different types of criminal cases. One such authority which codifies a longstanding common law rule of evidence in Virginia—the "shopbook rule" or business records exception—is Rule 2:803(6) of the Virginia Rules of Evidence. Vatter, id. Under the authority of Estelle, it is not proper for a federal habeas court to consider the appropriateness of the Virginia court ruling on proper construction and interrelationship of Virginia statutes and rules. So long as the business record exception as applied does not contravene the Confrontation Clause or some other specific constitutional provision, the federal habeas court cannot interfere with the state court's decision on this issue.

The applicability of the business record exception to toxicology reports in hospital records has been succinctly stated as follows:

> The toxicology report was shown to be a business record, recorded in the regular course of hospital business, contemporaneously made, and authenticated by its authorized custodian. This is a sufficient foundation for the admissibility of

> the hospital blood test as a business record.  Therefore, the trial
> court did not abuse its discretion in admitting the hospital
> toxicology report under the "business records" exception to the
> hearsay rule, as evidence of the truth of its contents.

Stevens v. Commonwealth, 44 Va. App. 122, 136, 603 S.E.2d 642, 649 (2004).  Unlike the

testimonial document at issue in Melendez-Diaz, a certificate of analysis of suspected cocaine

prepared by a forensic analyst at the state lab, at the request of law enforcement, the toxicology

reports in the hospital records were not prepared specifically or primarily for use in court.  The

hospital physicians, several of whom testified, were trying to diagnose Shelby's condition so

that they could provide appropriate treatment.  The results of the blood analysis were essential

to the differential diagnosis.  The Fourth Circuit Court of Appeals explained why medical

records can be presumed trustworthy and reliable, without need for introducing the full chain

of custody:

> There is good reason to treat a hospital record entry as
> trustworthy.  Human life will often depend on the accuracy of
> the entry, and it is reasonable to presume that a hospital is staffed
> with personnel who competently perform their day-to-day tasks.
> To this extent at least, hospital records are deserving of a
> presumption of accuracy even more than other types of business
> entries.

Thomas v. Hogan, 308 F.2d 355, 361 (4th Cir. 1962).

The Supreme Court has also recognized that some documents are admissible, despite

their hearsay status, without violating the Confrontation Clause:  "Documents kept in the

regular course of business may ordinarily be admitted at trial despite their hearsay status.  See

Fed. Rule Evid. 803(6).  But that is not the case if the regularly conducted business activity is

the production of evidence for use at trial."  Melendez-Diaz, 557 U.S. at 321.

The state habeas court concluded that the toxicology reports were diagnostic tests used to diagnose Shelby Vatter's condition and decide upon a course of treatment.  Accordingly, the general rules of admission of business records as an exception to the hearsay rule were applicable.  Vatter, No. 1883-17-3 at *3.  This decision was a reasonable determination of facts based on the record, and the decision was a reasonable application of existing federal law.  The court cannot grant relief on this claim.

### III.

For the reasons stated, the state court decisions in this matter are based upon a reasonable determination of facts and a reasonable application of federal law.  Accordingly, the respondent's motion to dismiss must be granted.

When issuing a final order adverse to a § 2254 petitioner, the court must issue or deny a certificate of appealability.  Fed. R. Gov. § 2254 Cases 11(a).  A certificate of appealability may issue only if the movant has made a substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2).  The movant must show that reasonable jurists could debate whether the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.  Miller-El v. Cockrell, 537 U.S. 322, 338 (2003); Slack v. McDaniel, 529 U.S. 473, 483–84 (2000).  Vatter has not made such showings in this case.

For the foregoing reasons, the court will grant respondent's motion to dismiss, dismiss the petition for a writ of habeas corpus, and deny a certificate of appealability.

**ENTER:**  This 3rd day of March, 2022.

Michael F. Urbanski
Chief U.S. District Judge
2022.03.03 08:46:03
-05'00'

_____

Michael  F. Urbanski
Chief United States District Judge